## AMERICAN STEEL BARGE CO. v. CHESAPEAKE & O. COAL AGENCY CO.

(Circuit Court of Appeals, First Circuit. April 16, 1902.)

No. 391.

1. SHIPPING—TIME CHARTER—RESERVATION OF LIEN ON SUBFREIGHT.

A provision of a charter party that "the owners shall have a lien on all * * * subfreight for charter money due under this charter" cannot be applied, as against a cargo owner other than the charterer, beyond the amount of freight stipulated in the bill of lading; but to

such extent it is valid and enforceable, as creating an admiralty lien on the freight, even where the charter is a demise of the ship.

2. SAME.

It is competent for a time charterer, by a provision in the charter, whether it is or is not a demise of the vessel, to pledge the freight to be earned by her during the term to secure the payment of the charter hire; and such a provision gives the owner an equitable lien in admiralty, as of the date of the charter, on any freight subsequently stipulated to be paid under a bill of lading, and subrogates him to the lien of the charterer for the freight, and to the remedies of the charterer to enforce its payment.

8. SAME—PROCEEDING TO ENFORCE LIEN—ARREST OF CARGO.

The proper proceeding by a shipowner to enforce the lien given by such charter provision is by a libel, in conformity to admiralty rule 38, against the subfreight alone, with process requiring the holder of the bill of lading or owner of the cargo to bring the amount of the freight into court. If not so brought in, a summary process may issue against the owner of the cargo, or against the cargo. A proceeding against the cargo is not justified until after an order to pay in the freight; but, if a warrant of arrest has prematurely issued, and it is afterward ascertained that there is a contest which would probably have ultimately resulted in its issuance, the arrest will be retained, and compensation made in costs for the fact that it was premature.

4. SAME—PAYMENT OF FREIGHT TO CHARTERER.

A cargo owner, who, on the issuance to it of a bill of lading, paid to the charterer a portion of the freight, in good faith, is protected in such payment as against a lien on subfreight reserved by the shipowner in the charter, of which the shipper had no knowledge or notice.

5. SAME—PRIORITY AS BETWEEN LIEN AND RIGHT OF SET-OFF.

A lien on subfreights reserved by a shipowner in a time charter will be given preference over a general right of set-off existing in favor of a cargo owner against the charterer, especially where, so far as appears, his lien, which relates back to the date of the charter, is prior to the charterer's indebtedness to the cargo owner.

Appeal from the District Court of the United States for the District of Massachusetts.

For opinion below, see 107 Fed. 964.

Frederic Dodge, for appellant.

Joseph B. Warner, for appellee.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

PUTNAM, Circuit Judge. This appeal will be found not to concern the cargo of coal, as the title of the case would indicate, but the freight thereon.

The steamer City of Everett, belonging to the American Steel Barge Company, the libelant, was chartered by it, under a time charter, on March 1, 1898, to the Atlantic Transportation Company; the charter money being payable in monthly installments in advance. The controversy now existing arose over the installment due on December 5, 1898, which remains unpaid. At or about that time the Atlantic Transportation Company became insolvent and went into the hands of a receiver, and has since so remained. The charter, barring its formal parts, is given at length in the opinion of the learned judge of the district court. That opinion discusses very fully the question whether its legal effect is merely a chartering of

the entire space of the steamer, or a proper demise, and the same question has been argued before us at great length. The libel alleges that the owners "let" the steamer to the charterers, which, in a libel, or in other judicial pleading, can be properly construed only as a demise. If it were important to the case, we would have no question that the libel properly construed the charter in this respect.

Whether or not the charter operated as a demise, the master was, for all the purposes of this case, the agent of the charterer. This is particularly emphasized by the fact that the charter closed a provision that the master should be under the orders and direction of the charterer, as follows:

"And the charterer hereby agrees to indemnify the owners from all consequences and liabilities that may arise from the captain signing bills of lading, or not otherwise complying with the same."

Indeed, the libel alleges, and it is not controverted, that the bill of lading covering the cargo in question was signed by the master "by the direction of said charterer or its agents." There can be no question that, so far as the controversy before us is concerned, the master was the agent of the charterer, and the bill of lading of the cargo in question was given by him as such agent.

The case turns on the following expression in the charter: "That the owners [meaning the owners of the vessel] shall have a lien upon all cargoes and all subfreight for charter money due under this charter." In Baumwoll Manufactur von Carl Scheibler v. Furness [1893] App. Cas. 8, Lord Chancellor Herschell spoke of this clause as one "which is a provision as between charterer and shipowner," apparently having in mind in that connection the case where only a ship's space is chartered. Neither the origin nor the history of the clause on which this case turns can be clearly traced. The learned judge of the district court suggested that it was framed when charterers intended ordinarily to freight ships with their own property; but it is to be noted, however, in this connection, that it attempts to give a lien on cargo, and also a lien on subfreights. The former (that is, on the cargo) was originally regarded as existing merely at common law. It has been largely so discussed in the case at bar. It is now held that the relation of the vessel to the cargo does not create a merely common-law lien, but an admiralty lien, good until it is either expressly or impliedly waived. This was explained by us in Wellman v. Morse, 22 C. C. A. 318, 76 Fed. 573. Nevertheless it may be that it was because of the old impression that the lien for freight arises at common law, and so depends on possession, that, so far as this clause gave a lien on the cargo, it was thought by some applicable only to a charter for space, or to cases where the charterer owns the cargo. That, however, it was not framed simply with reference to furnishing a lien on a cargo belonging to a charterer, seems to follow from Paul v. Birch, 2 Atk. 621, where, as early as 1743, it was held sufficient to bind to the owner of the ship a cargo in which the charterer had no interest.

Bearing in mind, however, that the clause gives a lien on sub-freights as well as a lien on cargo, it will be found that we are relieved on this appeal from any investigation of the rules of the common law with reference to liens, so extensively argued before us, or from any investigation of the nature of liens for freight, further than referring to Wellman v. Morse, as we have done. We must also add that, whatever obscurity attends the origin and history of the clause in question, there is none in that portion of it which relates to subfreights, and no difficulty in its application to the case at bar, whatever the character of the charter in question.

It is certain, however, that this clause cannot be applied, as against the cargo owner, beyond the amount of freight stipulated in the bill of lading. We understand that this is conceded by the libelant; but, in any event, the rule is fully established by Scrutton on Charter Parties and Bills of Lading (4th Ed.) at pages 285 and 286, and by the decisions cited in the note thereto, as well as by many other cases not there cited, among which are Paul v. Birch, ubi supra; Shand v. Sanderson, 4 Hurl. & N. 381; and Gilkison v. Middleton, 2 C. B. (N. S.) 134. Paul v. Birch is very badly reported, as is well said in Carv. Car. by Sea (3d Ed.) 774. It was, however, carefully explained in Abb. Shipp. (5th Eng. Ed.; the last edition, revised by Lord Tenterden), at page 171, and is there shown to be clear on this point.

Inasmuch as the clause in question is clear so far as relates to subfreights, and can receive to that extent full effect without difficulty, no legal tribunal is authorized to strike it out of this charter, even though it was primarily intended for use in one which did not demise the ship. It is true that in all the English cases which we have found, including especially those cited in the note to page 286 of Scrutton's Charter Parties and Bills of Lading, the charter was to load the vessel, which, of course, is only a contract for space; yet Leggett's Charter Parties (1894) 530, lays down a broad rule, that it never seems to have been disputed that a shipowner can hold the goods to the extent of the bill of lading freight, and that, "Where the vessel has been put up by the charterer as a general ship, the same rule holds good." While probably this must be qualified with reference to the shipowner who has demised a ship, so far as holding the goods by a common-law possessory lien is concerned, it need not be qualified where he has been given by the charterer an interest in the bill of lading freight, thus carrying the incidental admiralty right to pursue the goods for that freight in the event it remains unpaid.

Strictly speaking, the charter money of a ship chartered on time is not freight. Yet it is such in common parlance, and also such in the law of insurance. This fact is sufficiently explained in Abb. Merch. Ships (14th Ed.) 662, 663. Therefore it cannot reasonably be questioned that "subfreights," which is an expression in common use and easily understood, embraces all freights which a charterer stipulates to receive for the carriage of goods, whether he takes the ship by demise or otherwise. It follows that we must hold that the parties to this charter intended to bind to the owner

of the vessel the freight, under this bill of lading. We need not trouble ourselves on the question whether there was any intention to pledge the cargo, or whether the cargo could be pledged directly, because the freight is the principal thing, and it is sufficient for all the purposes of the clause in question that the cargo is held incidentally to secure its payment. In determining whether, on this libel, the intention of the parties to pledge the freight can be practically worked out, we are to remember that it is the clear law that admiralty proceeds on equitable principles, regardless even of many peculiarities which control the chancery courts. O'Brien v. Miller, 168 U. S. 287, 297, 18 Sup. Ct. 140, 42 L. Ed. 469; The Iris, 40 C. C. A. 301, 100 Fed. 104, 114. Inasmuch as the questions involved in this appeal relate both to the right and the method of procedure, we may as well observe here that it is thoroughly understood that the equitable rules of the admiralty apply to each.

Even at common law it has long been settled that the owner of a vessel can sell or pledge the future freights to be earned by virtue of an enterprise which she has entered on, although in an inchoate condition. The text writers are to this effect, and also the courts. Leslie v. Guthrie, 1 Bing. N. C. 697, explaining in this respect the earlier case of Robinson v. Macdonnell, 5 Maule & S. 228. The rule is, of course, so settled in equity. Lindsay v. Gibbs, 22 Beav. 522, 528. It must be even more freely admitted in admiralty, which proceeds on broad equitable principles, as we have already stated. It requires no line of argumentation to demonstrate that this rule reaches the relations of the owner to the charterer, whether the charterer enters into the possession of the vessel or not. In the present case, if the charterer did not enter into possession, the clause in question merely reaffirmed a lien which the owner already had, even at common law. If the charterer entered into possession of the vessel, he stood as owner, and could, as such, pledge inchoate freights. His charter was, moreover, in this particular, a qualified one, and his title to all freights accruing thereunder necessarily qualified as of the date of the charter, and in this respect precisely analogous in principle to one who obtains a qualified title to a chattel. Applying either of these lines of reasoning, the rights of the owner of the vessel under the clause in question reverted to the date of the execution of the charter, and did not accrue as of the date of the giving of the bill of lading, as now supposed by the owner of the cargo.

As, therefore, on the broad rules of the admiralty, the owner of the vessel had a lien on this freight, which accrued as of the date of the charter, he stood, in the eyes of the admiralty, which requires no formal instrument, with all the rights of an assignee under a deed of assignment. In the admiralty, his position and rights are exactly those of the holder of a bottomry bond of both ship and freight, who may, if his bond comes due, discharge the cargo from the lien therefor by receipt of the freight (Benson v. Chapman, 2 H. L. Cas. 696, 721), or may proceed in his own name in admiralty against the freight for the collection thereof, as was explained, under

very special circumstances, in Place v. Potts, 5 H. L. Cas. 383. Scrutton, Charter Parties (4th Ed.) 275, 277.

The proper remedy in admiralty, which does not have the strict regard to parties which is had by the chancery courts, is a libel, in the name of the party holding the bottomry bond, or other lien on freight, against the freight. It is not necessary to make party to the proceeding the assignor, or whomsoever has the remaining beneficial interest in the freight, as is required in equity, for the reason that the admiralty has no strict rules as to parties, and because, also, the proceeding being in rem, all the world are parties thereto. In accordance with admiralty rule 38, which only reiterates the uniform and ancient practice of the admiralty, the appropriate primary process is a monition to the holder of the bill of lading, or owner of the cargo, requiring him to pay the freight into the registry of the court. It is of interest to refer to the earlier stages of Place v. Potts, 8 Exch. 705, 707, as pointing out fully the method of proceeding. In view of these observations, the libelant correctly states the case when he argues that the lien asserted is primarily the lien reserved on the subfreight, and that it is not a lien on the cargo simply as cargo, but on it as representing the bill-of-lading freight, and as bound to the vessel therefor. The obscurity of the case has come mainly, if not entirely, from the fact that the proceedings in the district court apparently followed the terms of the charter, and claimed, not merely a lien on the subfreight, with a lien incidental thereto on the cargo, but directly a lien on both freight and cargo. The proper proceeding would have been to file a libel against the subfreight alone, naming the party charged with the possession thereof, who in this case was the holder of the bill of lading, or the owner of the cargo, and asking process requiring him to bring into court what would be due from him on discharge of the vessel, all as provided in admiralty rule 38. Then, if the freight according to the bill of lading had not been brought into court, or sufficient cause shown to the contrary, summary process would have issued on a supplemental libel or petition against the holder of the bill of lading, or against the cargo if the lien for freight had not been lost. At the proper time, and under the proper circumstances, a libelant holding a lien on subfreight becomes subrogated to all the remedies of the charterer, which includes a proceeding in personam against the holder of the bill of lading, or against the cargo in the event the lien for freight has not been lost; but also, like the charterer, he could not properly institute this proceeding until there had been default in payment of the freight, unless under very peculiar circumstances, which do not arise in the case at bar.

All expressions, if any such there be, that any party, whether the holder of bottomry, or a seaman, or a formal assignee, or other lienor, having a right to proceed against freight, may properly at once libel the cargo therefor, must be considered with regard to the circumstances of the particular case. One of the leading authorities relied on by the libelant, and understood by him to be cited to this effect in Williams & B. Adm. Prac. (2d Ed.) 251, is The

Lady Durham, 3 Hagg. Adm. 196, 200, where the rule is laid down exactly to the contrary. Sir John Nicholl there starts with the proposition that a mariner has, of course, a lien for his wages on freight, if earned; but he states that he has "no lien on the cargo as cargo," and that "his lien is upon the ship, and on the freight as appurtenant to the ship." He adds that, "so far as the cargo is subject to freight, he may attach it as security for the freight that may be due," but he does not say when he may attach it. The next citation in Williams & Bruce is The Victor, Lush. 72. The real question which Dr. Lushington considered in that case was whether the cargo was holden with the vessel for damages in collision. It is true that the cargo was arrested, and was stated to have been arrested for freight; but, its owner having paid in the freight to the account of the court, Dr. Lushington pronounced for the release of the cargo, with costs and damages. So the general expressions of Dr. Lushington in The Leo, 6 Law T. (N. S.) 58, to the effect that the cargo may be arrested under like circumstances, were aside from the real question in the case, were purely incidental, and were not the result of any proposition brought before him by the parties. In The Roecliff, L. R. 2 Adm. & Ecc. 363, Sir Robert Phillimore merely held that, on a motion for the release of a cargo aboard a vessel which had been attached in a case of collision, the cargo and vessel belonging to the same owner, the freight must be paid into court before the cargo could be discharged. The only question there was whether, inasmuch as the ship and cargo belonged to the same person, there could be any freight which, as freight, was liable to the injured vessel. No question arose as to the order of proceeding against the cargo. The decree as to payment of freight was strictly analogous to a decree which, under like circumstances, an admiralty court would prudently make with reference to freight due from cargo under a bill of lading, to the effect that, after the cargo was unladen, and before the lien was lost, the freight be paid into court. But it is not worth while to examine further the cases cited in Williams & Bruce, because it is clear that the reference to the text made by the libelant cannot be understood as understood by it; and, if it could be so understood, it would be, in our admiralty courts, superseded by admiralty rule 38, which does not justify any proceeding against the cargo, under circumstances like those on this appeal, until after an order to pay in the freight, unless in peculiar cases. A suitable precedent for proceeding against freight by one holding a lien thereon is found in Ben. Adm. (2d Ed.) 556. This conforms in all respects to the observations which we have made.

But on the whole, the question involved in this branch of the case is merely one of the order of procedure, and it could affect only the costs. Under the broad rules of admiralty, if a warrant of arrest issues prematurely, and it is afterwards ascertained that there is in fact a contest which would probably have ultimately resulted in its issue, the arrest will be retained, and the fact that it is premature compensated for in costs. Moreover, on this appeal the cargo was not, in fact, arrested; but, on a warrant for arrest issuing, bail was

given. Prior to the giving of the bail, the parties filed a stipulation by virtue of which the libelant agreed to limit its claim against the cargo to the freight earned thereon. Further, bail was given only for the agreed value of the freight. It is true that the stipulation was without prejudice to the defense that there was no lien on the cargo; but, in view of the principles which we have stated, this was immaterial. We have shown that, even if the practical result of the proceedings on the libel had been to attach the cargo, it would not have affected the case, except on the question of costs; and the fact is that the practical result is in effect the same as though the freight had been brought into court by the owner of the cargo, and afterwards paid out again on stipulation. As admiralty looks mainly to practical results, we would not have considered this branch of the case so fully, except for the fact that it seems to have become confused with the merits, to which, indeed, it has no relation whatever. The merits involve the simple and clear proposition which we have fully explained, —that the owner of the vessel was entitled to proceed against all subfreights, including that now in question, by virtue of the lien thereon given him in the charter.

This brings us to the only difficult propositions in the **case.** The answer, as amended, alleges that on December 30, 1898, which was the date of the bill of lading, the owner of the cargo, in whose interest the bill of lading was held, paid the master, on account of the freight to become due, $201.64, in order to provide money for trimming charges, and also on the same day, on account of freight, the further sum of $1,500. It further alleges that both payments were made in good faith, and that at the time the payments were made the owner of the cargo had no knowledge as to the ownership of the vessel. These facts are not disputed, and, indeed, it cannot be denied that the owner of the cargo had not at that time been advised that the owner of the vessel had reserved in the charter any lien on the subfreight. Probably a knowledge of these facts would not have affected the propriety of the payment of the $201.64 required by the vessel to enable her to get out of port with her cargo; and the absence of that knowledge protected the holder of the bill of lading in the payment of the $1,500, on rules so well settled and so universally known that it would be a waste of words to discuss that particular proposition. We will, however, refer to The Karnak, L. R. 2 P. C. 505, clearly asserting it. The earlier case of The Salacia, Lush. 578, held, perhaps, otherwise; but, of course, the decision of the privy council in The Karnak must be accepted as the last statement of the law in England. It is so accepted in Abb. Merch. Ships (14th Ed.) 209. Therefore, so far as the two items of $201.64 and $1,500 are concerned, they must be allowed to the claimant of the cargo as against the freight reserved in the bill of lading.

By amendment to the answer, made several weeks after the original was filed, the claimant of the cargo, who is its owner, alleges that on or before December 30, 1898, the charterer (that is to say, the corporation known as the Atlantic Transportation Company) was indebted to the claimant in a sum largely exceeding the freight in question; that the Atlantic Transportation Company became insolvent

before the filing of the libel, so that a receiver of its assets was appointed by the decrees of the courts of several states; that said receiver is still in charge of its assets; and that therefore the claimant was unable to obtain payment. It is not stated precisely which way the balance would stand on an accounting of all matters between the claimant and the Atlantic Transportation Company, but the case has come to us on the assumption that it would be in favor of the former, and that such is the fact is not questioned. Neither does it appear how long before December 30, 1898, the debt in question accrued. There is nothing to show that it existed on March 1, 1898, when the charter before us was made. If such were the fact, inasmuch as the claimant of the cargo demands a set-off, the burden rests on it to show it. As the record stands, we are not justified in finding that the indebtedness to the claimant existed on March 1, 1898.

This brings us to the question whether the claimant of the cargo is entitled to a general set-off against this freight, notwithstanding the libelant's lien. We have shown that the owner of the cargo was entitled to look to the charterer as the party with whom it was dealing with reference to the cargo and the freight thereon. Moreover, the rule, of course, is well settled that, inasmuch as the Atlantic Transportation Company has gone into judicial administration as insolvent, all set-offs are to be allowed, so far as can be done with due regard to the equities of strangers. Hutchinson v. Le Roy, 113 Fed. 202, decided by us in January, 1902. Neither can it be questioned that, as an ordinary rule, every assignee of a chose in action not in its nature negotiable takes it subject to all equities, including, of course, the rights of set-off existing between the original parties. Many authorities sustaining this well-known proposition may be found in Pom. Eq. Jur. (2d Ed.) § 704. Yet after all, in cases like that at bar, not governed by express statute provisions, the equities of other parties must be considered before all the rights of set-off can be determined; and the result of the consideration must be in favor of the one having the greater equity; or, if equities are balanced, then in favor of the one having priority. This rule is too well settled to need discussion. We have said that the burden rests on the party claiming a set-off to maintain it, so that he must fail if the equities are otherwise equally balanced, unless he shows that his equity is the earlier. On this appeal the claimant of the cargo, as we have stated, has not shown that its equity was prior in date to that of the libelant.

In Wilson v. Gabriel, 4 Best & S. 243, the queen's bench held that the assignee of a freight in the course of being earned is subject to the rules of set-off which we have stated to be the usual ones; but this case must be regarded as rendered inapplicable to admiralty proceedings, or as reversed by the house of lords in Weguelin v. Cellier, L. R. 6 H. L. 286, where it was held that in admiralty there can be no set-off against freight which by the terms of the bill of lading is payable on delivery of cargo, to the prejudice of one who had become an assignee thereof before the unlading. Inasmuch as, on this record, the libelant intervened before the delivery of the cargo had been completed to the extent of discharging the lien for freight, the case seems to come within Weguelin v. Cellier, last cited. Nevertheless it

can be disposed of on clearer rules. We have already shown that the right of the libelant relates back to the date of the charter, and that, on the record, we must assume that its equity is earlier than the equity of set-off of the owner of the cargo. Each party proceeded in good faith, and each in ignorance of the equitable rights of the other. In those respects their equities were balanced, but on this record the equity of the libelant was earlier. In addition to that, it is a specific equity, relying on the pledge of this particular fund, while the equity of the owner of the cargo is not specific, but only general, without anything to show that reliance was placed on this freight with the view of applying it to the diminution of the charterer's indebtedness. We need not determine what would have been the equities if the set-off claimed by the cargo owner had risen out of credits given on the expectation of offsetting them against this freight. Under the circumstances, the equity of the libelant must prevail against a general set-off, and the decree of the district court must be reversed to that extent.

This opinion has pointed out sufficient circumstances to make it plain that, from the equitable positions held by the admiralty with reference to costs and interest, neither party is entitled to either the one or the other.

The decree of the district court is reversed, and the case is remanded to that court, with directions to enter a decree in favor of the libelant for the amount of the freight according to the bill of lading, less the sum of $1,701.64; and neither party will recover any interest or costs in either court.