## LARSEN v. 150 BALES OF SISAL GRASS.

(District Court, S. D. Alabama. July 31, 1906.)

No. 1,110.

SHIPPING—TIME CHARTER—RESERVATION OF LIEN ON CARGOES AND SUB-FREIGHTS.

The effect of a provision of a time charter giving the owner of the vessel a lien on all cargoes and subfreights for the charter hire, as against a shipper other than the charterer, is merely to subrogate the vessel owner to the rights of the charterer, and where the shipper has paid the freight to the charterer in good faith, he is protected in such payment, and no lien on the cargo can be asserted by the vessel owner more than by the charterer.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, § 199.]

In Admiralty. Libel for freight.

The following are the facts agreed upon: The claimant, Avelino Montes S. en C., was, at the time of the filing of the libel in this cause and at the time of the shipment of the goods, the owner of the 150 bales of sisal grass, which were arrested under the process in this cause: these bales being a part of a cargo of sisal grass shipped from Progresso, Mexico, upon the steamship Atlas, whereof the libelant was and is master, which shipment was made on the 15th day of December, 1905, for carriage of the said goods to Mobile, Ala. The said steamship was a Norwegian steamship under the Norwegian flag and was at that time chartered and operated by the Compania Yucateca. The steamship Atlas was being operated as a general merchandise ship, and before the trip upon which the sisal grass in question was shipped, the Compania Yucateca made a trip with said vessel between Progresso and Mobile, transporting therein, for reward, as a general merchandise ship, the goods of various persons between said points. M. Martin C. was the agent at Progresso of the said Compania Yucateca, and, as such agent, was authorized to and did solicit cargoes for said vessel, and agreed upon the rates of freight to be charged to the several shippers, and the terms upon which they were to be paid, either in advance or upon delivery; and when agreed to be paid in advance, he collected the freight and issued to the shippers instruments in the form attached as exhibits to the answer in this case, and that on the former trip the freight so shipped was delivered according to the terms of such instruments. The said Martin C. solicited freight for said vessel from intervener, and agreed to transport for him on said vessel 1,999 bales at 11 cents per hundred pounds, from Progresso to Mobile; the freight to be paid in advance, and the same being a reasonable freight for the service to be rendered. Intervener delivered to said vessel for transportation under such agreement 1,999 bales of sisal grass, and paid to the said Martin C. the freight in advance, which aggregated the amount of $777.12, and the said Martin C. executed and delivered to him two instruments, styled "bills of lading" in the answer, and attached thereto. The said Avelino Montes C. had no knowledge of the charter of said vessel by the Compania Yucateca, nor did he know under what title or right it was being operated by that company, nor whether freight hire of the said vessel had been paid by the charterers to the owners or not. For the said shipment the said Avelino Montes en C. did not ask for or require of the master any bill of lading or present any to him therefor, and the master of the ship was not by any person required or requested to sign any bills of lading for said cargo, and did not in fact sign bills of lading therefor; but under instructions from charterer proceeded to Mobile with said cargo in the said vessel with orders to deliver the same to Alberto Mendes. When the vessel was ordered to proceed to Mobile, and when she hove up anchor so to do, there was handed to the master, by said agent of the said charterers, the ship's papers, and other papers including the health certificate, clearance papers, invoices, and two papers in the forms of bills of lading. The charter of the

vessel was for the term of three months; the charter hire to be paid monthly in advance. The hire commenced to run on the 16th day of November, 1905, and was paid by the charterers for the first month; but the hire for the second month, due and payable on the 16th day of December, 1905, was not and hath not been paid by the charterers. The master of said vessel, claiming to have a lien under the terms of the charter party, for the security of the owners, upon the cargo and freight for the hire, demanded payment of the same, and endeavored to effect some arrangement for the security of the same or some part of the same, but without success, and thereupon filed the said libel against a part of the said cargo. The stipulation in the charter party annexed to libel in regard to lien on freight for charter hire reads as follows: "That the owners shall have a lien on all cargoes and all subfreights for any amounts due under this charter and the charterers shall have a lien upon the ship for all moneys paid in advance and not earned."

Pillans, Hanaw & Pillans, for libelant.
Gregory L. & H. T. Smith, for intervener.

TOULMIN, District Judge (after stating the facts). In the case of the American Steel-Barge Co. v. Cargo of Coal (D. C.) 107 Fed. 964, there was a libel by the owner of a steamer chartered by a transportation company, by a charter, the material parts of which were substantially like those in this case. The facts of that case were that the steamer took on a cargo of coal at Newport News, belonging to the claimant, consigned to the claimant's agent in Boston. The bill of lading was in the usual form, signed by the master. The freight payable was stated to be "as agreed." There was an agreement between the charterer and the claimant as to the rate of freight. The amount as fixed by the contract was, in the aggregate, $2,348.46. The steamer left Newport News on December 30, 1898. On that day the claimant paid to the charterer in New York, at the charterer's request, $1,500 on account of the freight to be earned by the steamer, and took from the charterer a receipt therefor. The charterer then was, and had been for some time, indebted to the claimant for coal to an amount largely exceeding the freight on the cargo in question. Upon the arrival of the steamer in Boston the libelant libeled the coal, and sought to hold it for the total amount of freight due thereon, at the rate agreed on. It asserted a lien upon the coal for freight, as the owner of a vessel which has earned freight in the carrying of a cargo; and relied especially upon the clause in the charter party giving "a lien upon all cargoes and all subfreight for charter money due under this charter."

The court said:

"The lien on subfreight given by the charter does not help the libelant, which here seeks to enforce, not a lien on freight, but a lien for freight. That a knowledge of the existence of the charter party does not bind the property of shippers other than the charterers for the rent due under the charter party has been decided [Paul v. Birch, 2 Atk. 621; The Volunteer, 1 Sumn. 551, 573, Fed. Cas. No. 16,991; The Albert Dumois (D. C.) 54 Fed. 529]; and this even where the bill of lading refers expressly to the charter. * * * A lien upon a cargo for its freight is created by the maritime law in favor of the person in possession of the ship. A lien upon the cargo for the charter rent is created by the charter in favor of the general owner of the vessel. That the libelant, as not in possession of the vessel, cannot avail itself of the first lien has been already stated. * * *"

The court concluded by saying that: ·

"The shipper dealt with the charterer as charterer, or rather with the charterer as it was entitled to deal with one who had control of the vessel, whether owner or charterer."

In short, the court held that the provision in the charter giving a lien upon all cargoes and all subfreight for charter money due under the charter could not be construed to give the owner a lien upon cargo owned by third persons, and shipped under contract with the charterer for charter money, nor has he any lien on such cargo under either the charter or the maritime law to compel the shipper to pay freight to him; such lien being created by the maritime law in favor of the person in possession of the ship.

The case was appealed to the Court of Appeals for the First Circuit. That court held that it was competent for a time charterer, by a provision in the charter, whether it is or is not a demise of a vessel, to pledge the freight to be earned by her during the term to secure the payment of the charter hire; that such a provision gives the owner an equitable lien in admiralty, as of the date of the charter, on any freight subsequently stipulated to be paid, and subrogates him to the lien of the charterer for the freight, and to the remedies of the charterer to enforce its payment. American Steel Barge Co. v. Chesapeake & O. Coal Co., 115 Fed. 669, 53 C. C. A. 301. It also held that a cargo owner who, on the issuance to it of a bill of lading, paid to the charterer a portion of the freight, in good faith, is protected in such payment as against a lien on subfreight reserved by the shipowner in the charter, of which the shipper had no knowledge or notice. In the course of the opinion, the Court of Appeals said:

"At the proper time, and under the proper circumstances, a libelant holding a lien on subfreight becomes subrogated to all the remedies of the charterer, which * * * includes a proceeding against the cargo in the event the lien for freight has not been lost: but. also like the charterer, he could not properly institute this proceeding until there had been default in payment of the freight. unless under very peculiar circumstances, which do not arise here."

The court also said:

"We have also shown that the owner of the cargo was entitled to look to the charterer as the party with whom he was dealing with reference to the cargo and the freight thereon." 115 Fed. 669, 53 C. C. A. 301.

So in this case the libelant, holding a lien on the subfreights, would be subrogated to any remedy possessed by the charterer, which would include a proceeding against the cargo of sisal grass in question in the event the lien has not been lost or satisfied by the payment of the freight on it. Here there has been no default in the payment of the freight. The freight having been paid to the charterer, he could not properly institute this proceeding, and hence there is no remedy to which the libelant could be subrogated, and, like the charterer, he could not properly institute this proceeding. The Court of Appeals, in the case cited, recognized as valid and binding the payment to the charterer of the $1,500 on account of the freight, which was paid in advance to the charterer by the shipper, but reversed and remanded the case to the court below, with directions to enter a decree in favor of the libelant for the amount of the freight agreed on and earned,

147 F.—50

less the sum paid on account of the same to the charterer, and an amount advanced to the master to provide for certain charges against the ship. The difference between the amount of freight claimed by the libelant and the sum paid by the claimant of the cargo on account of freight and the charges referred to was $1,701.64, which amount the claimant undertook to set off against the demand and lien for the freight. This the court held could not be done. The set-off was based on an indebtedness of the charterer to the claimant which the court held could not be maintained on certain equitable grounds announced by it, and said: "Under the circumstances, the equity of the libelant must prevail against a general set-off, and the decree of the District Court must be reversed to that extent." Raymond v. Tyson, 17 How. 53, 15 L. Ed. 47; Drinkwater v. The Brig Spartan, 1 Ware, 149, Fed. Cas. No. 4,085.

On the authorities cited, and which seem to me to be in accordance with reason and equity, the libel is dismissed.